**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **DANIEL P. NELSON, Regional** | ) | |
| **Director of Region 13 of the National** | ) | |
| **Labor Relations Board, on behalf of** | ) | |
| **the National Labor Relations Board,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | **17 C 1443** |
| **v.** | ) | |
| | ) | **Judge John Z. Lee** |
| **ADVOCATE HEALTH AND** | ) | |
| **HOSPITALS CORPORATION,** | ) | |
| **d/b/a Advocate Medical Group,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## MEMORANDUM OPINION AND ORDER

On June 29, 2016, the Illinois Nurses Association filed an unfair labor practices charge with the National Labor Relations Board ("NLRB") against Respondent Advocate Health and Hospitals Corporation, d/b/a Advocate Medical Group ("Advocate"). The charge accused Advocate of interfering with the rights of employees at healthcare clinics located in Walgreens stores to labor organization and of refusing to engage in collective bargaining with these employees in violation of § 8(a)(1) and (5) of the National Labor Relations Act ("the Act").

The Director of Region 13 of the NLRB ("the Director"), acting on behalf of the General Counsel of the NLRB, has now filed a petition before this Court seeking a preliminary injunction pursuant to § 10(j) of the Act pending final disposition of the administrative proceeding. Advocate has filed a motion for summary judgment as to the claims raised in the petition. In addition, Advocate has filed a motion asking the Court to take judicial notice of the NLRB's website in the course of considering the Director's petition.

The Court held an evidentiary hearing on the petition. In light of the evidence presented at the hearing, as well as the evidence in the administrative record, the Director's petition for injunctive relief is granted. Advocate's motion for summary judgment and motion to take judicial notice are denied.

# I. Background[1]

## A. Advocate's Refusal to Engage in Collective Bargaining

Take Care Health Illinois, P.C. ("Take Care Health") is an independently owned professional corporation that is affiliated with Take Care Health Systems, LLC. Admin. Tr. at 226–27. In turn, Take Care Health Systems, LLC is a wholly owned subsidiary of Walgreens. Resp't's Admin. Ex. 45, at 3, ECF No. 33. From 2011 to 2016, Take Care Health operated fifty-six healthcare clinics located inside of Walgreens stores throughout the Chicagoland area. *See* Admin. Tr. at 224–25.

The Illinois Nurses Association ("the Union") is the largest bargaining representative of nurses in Illinois, representing approximately 3,500 nurses across the state. *Id.* at 60, 729. In 2011, a majority of the advanced practice nurses (APNs) working in the fifty-six Take Care Health clinics elected the Union to be their exclusive bargaining representative. *See* GC Admin. Ex. 3.[2] Accordingly, on June 14, 2011, the NLRB certified the Union as the exclusive bargaining representative of a bargaining unit defined as follows:

> All full-time and regular part-time Clinical Coordinator II, Clinical Coordinator I, and Nurse Practitioners employed by the Employer in the following Illinois

---

[1] The following facts are based on the administrative record and the evidence presented at the preliminary injunction hearing. The transcript of the administrative proceeding ("Admin. Tr.") has been filed on the docket in six volumes, located at ECF Nos. 21–25 and 38. The transcript of the preliminary injunction hearing ("Hr'g Tr.") has been filed in three volumes, located at ECF Nos. 67–69. The Court will cite the transcripts using their original pagination, which runs continuously across the corresponding volumes.

[2] All of the General Counsel's administrative exhibits have been filed on the docket at ECF No. 84.

counties:  Boone, Cook, DeKalb, DuPage, Kane, Kendall, Lake, McHenry, Peoria, Tazwell, Will, and Winnebago; but excluding all market educators, physicians, all other professional employees, technical and maintenance employees, business office employees, other staff employees, office/clerical employees and guards, managers, and supervisors as defined in the [National Labor Relations Act].[3]

*Id.*  The caption of the NLRB's certification order makes it clear that the term "Employer" in this definition refers to Take Care Health.  *Id.*  After the NLRB issued this certification order, the Union and Take Care Health entered into a collective-bargaining agreement.  GC Admin. Ex. 2(c).

Advocate operates acute-care hospitals throughout Illinois.  *See* Admin. Tr. at 504–05.  It also provides primary-care and specialty-care medical services at various locations across the state, including at approximately seven Immediate Care Clinics and several family care sites.  *Id.* at 537–38, 594, 800, 828, 1032, 1105; *see also* Resp't's Admin. Exs. 15, 17, ECF No. 29.

On December 18, 2015, Walgreens and Advocate entered into a contract in which Advocate agreed to lease the fifty-six clinic sites located in the Walgreens stores in the Chicagoland area.  *See* Resp't's Admin. Ex. 33, ECF No. 31; *see also* Admin. Tr. at 871–73.  A few weeks later, on January 10, 2016, representatives from Walgreens and Advocate held a meeting to inform the APNs working in the Take Care Health clinics that Advocate would be closing the Take Care Health clinics and operating its own clinics at these sites.  Admin. Tr. at 274–75, 890–91.  During this meeting, the APNs were told that, as of May 14, 2016, they would lose their jobs with Take Care Health.  *Id.* at 274–75.  They were also told, however, that Advocate planned to fill positions in its new clinics by hiring APNs who had already been working at the clinics as employees of Take Care Health.  *See id.* at 435–36, 892–93.

---

[3]    It is undisputed that the terms "nurse practitioner" and "Clinical Coordinator" refer to APNs. *See, e.g.*, Pet'r's Br. at 2 n.2, ECF No. 70; Pet'r's Admin. Br. at 8 n.3, ECF No. 35; Admin. Tr. at 230–31.

Take Care Health ceased its operation of the clinics in the Walgreens stores on May 14, 2016. *See* GC Admin. Ex. 2(e). The next day, on May 15, 2016, Advocate began its operation of the clinics, which are now called "Advocate Clinics at Walgreens." Admin. Tr. at 545. In addition, as of May 16, 2016, Advocate had hired 143 of the 165 APNs who had previously been working in the clinics as Take Care Health employees. Joint Admin. Ex. 4, ECF No. 27. Prior to that date, Advocate had already employed approximately 220 APNs across its other medical services sites. Admin. Tr. at 878–79. Thus, once it hired these additional 143 APNs to staff its clinics in the Walgreens stores, Advocate employed a total of over 350 APNs. *See id.* Only 8 of these APNs worked at Advocate's Immediate Care Clinics (the relevance of which will be apparent later). Joint Admin. Ex. 4.

On May 17, 2016, a Union representative sent a letter to Advocate demanding that Advocate recognize and bargain with the Union as the exclusive bargaining representative of the APNs who worked—now as Advocate employees—in the clinics formerly operated by Take Care Health. GC Admin. Ex. 2(a). In support of this demand, the letter asserted in part:

> Advocate Medical Group is a successor employer of the Nurse Practitioners working in the Take Care Health Clinics located in Walgreens stores. The bargaining unit comprises all full-time and regular part-time nurse practitioners (NPs), including PRN nurse practitioners (PRNs), in the following Illinois counties: Cook, DeKalb, DuPage, Kane, Kendall, Lake, McHenry, Peoria, Tazwell, and Will. A majority of NPs working in these facilities were a recognized collective bargaining unit represented by Illinois Nurses Association.

*Id.* The letter also demanded that Advocate engage in "bargaining over an initial collective bargaining agreement," as well as "immediate negotiations regarding maternity and short-term disability coverage and [Advocate's] imposed changes regarding age of patients seen." *Id.*

Advocate responded to the Union's demand letter on May 19, 2016. GC Admin. Ex. 2(b). In its response, Advocate stated its refusal to recognize or bargain with the Union. *Id.*

Later that day, Advocate sent an e-mail to its APNs to inform them of the Union's demand for recognition, which the e-mail characterized as a "troubling recent development." GC Admin. Ex. 5. The e-mail announced Advocate's refusal to bargain with the Union, and it instructed the APNs: "Unless you know what you are signing and how your signature might be used, *we respectfully ask that you not sign anything in support of the [Union's] organizing activities.*" *Id.* (emphasis in original).

## B.    Administrative Proceeding Before the NLRB

On June 29, 2016, the Union filed a charge with the NLRB alleging that Advocate had engaged in unfair labor practices within the meaning of § 8(a)(1) and (5) of the National Labor Relations Act. GC Admin. Ex. 1(a). After investigating the charge, the Director, acting on behalf of the General Counsel of the NLRB, issued a complaint pursuant to § 10(b) of the Act. *See generally* GC Admin. Ex. 1(e) ("Admin. Compl.").

Like the Union's original charge, the Director's complaint alleged that Advocate had engaged in unfair labor practices within the meaning of § 8(a)(1) and (5) of the Act. *Id.* ¶ VII(a). In support, it claimed that the bargaining unit of APNs working in the Take Care Health clinics, which the NLRB had certified on June 14, 2011, was and continues to be an appropriate bargaining unit under the Act. *See id.* ¶ V(a)–(c). The complaint further alleged that the following similarly defined bargaining unit was also appropriate under the Act:

> All full-time and regular part-time nurse practitioners (NPs) including PRN nurse practitioners (PRNs) who are regularly assigned to work at Walgreens clinics and Immediate Care Clinics in the following Illinois counties: Cook, DeKalb, DuPage, Kane, Kendall, Lake, McHenry, Peoria, Tazewell, and Will, but excluding all other persons including, but not limited to, physicians, all other professionals, technical employees, maintenance, business office, clerical and other staff employees, and supervisors, managers and guards as defined in the National Labor Relations Act, as [a]mended.

*Id.* ¶ V(d).

An administrative law judge (ALJ) conducted a hearing from November 28 to December 6, 2016, on the allegations set forth in the Director's complaint. During the hearing, the ALJ heard testimony from several APNs working at Advocate's clinics in the Walgreens stores. The ALJ also heard testimony from various Union organizers, as well as some of Advocate's upper-level executives and supervisors.

The testimony showed that many of the APNs' working conditions under Advocate were the same as their working conditions under Take Care Health. For example, the APNs consistently testified that, as employees of Advocate, they performed the same types of nursing tasks in the clinics that they had previously performed as employees of Take Care Health. *See* Admin. Tr. at 147–48, 172, 298–99, 364, 374, 459. These tasks included seeing sick patients, performing wellness exams, and administering vaccines. *See id.* In addition, once Advocate took over operation of the clinics, the APNs worked the same hours and experienced the same style and frequency of supervision from upper-level managers as they had experienced under Take Care Health. *Id.* at 145–47, 283–84, 357, 446–47, 546–49, 560. Much of the equipment and furniture in the clinics also remained the same. *Id.* at 136–38, 281–83.

Advocate did, however, introduce some changes to the APNs' working conditions. One notable change is that Advocate permits APNs working in its clinics in the Walgreens stores to cover extra shifts at Advocate's Immediate Care Clinics or family practice sites. *Id.* at 162, 594. The Immediate Care Clinics, as well as some of the family practice sites, offer various medical services that are not performed at the clinics in the Walgreens stores, such as x-rays, electrocardiograms, vaginal exams, and suturing. *See, e.g.*, *id.* at 371–73, 702–03. The family practice sites further offer pediatric care. *Id.* at 854. As of the time of the administrative hearing, only 9 of the 143 APNs employed at Advocate's clinics in the Walgreens stores had

ever taken shifts at the Immediate Care Clinics, and only 4 of these 143 APNs had ever taken shifts at Advocate's family practice sites. *See* Pet'r's Admin. Br. at 18–19 (citing Resp't's Admin. Ex. 26, ECF No. 30).

After the Director rested his case in the administrative proceeding, Advocate's counsel orally moved to dismiss the Director's complaint. Admin. Tr. at 501. The ALJ denied the motion from the bench, on the ground that the Director had proved a *prima facie* case sufficient to survive a motion to dismiss. *Id.*

## C. Section 10(j) Proceedings

On February 24, 2017, while awaiting the ALJ's decision on the merits of the administrative complaint, the Director filed a petition for preliminary injunction before this Court pursuant to § 10(j) of the National Labor Relations Act. Pet., ECF No. 1. On March 16, 2017, the Director filed an amended petition. Am. Pet., ECF No. 20. The amended petition requests that the Court enter an injunction enjoining Advocate from engaging in unfair labor practices under § 8(a)(5) of the Act and ordering Advocate to bargain with the Union in good faith pending a final decision from the NLRB. *Id.* at 10–11.[4]

The Court permitted the parties to conduct expedited discovery and scheduled a preliminary injunction hearing from April 26 to April 28, 2017. Order of 3/9/17, ECF No. 18. While discovery was underway, Advocate filed a motion for summary judgment with regard to

---

[4] The amended petition also makes several references to the allegations of unfair labor practices under § 8(a)(1) that the Director raised in the administrative proceeding. *See* Am. Pet. ¶¶ 4, 5, 7(m). In its prayer for relief, however, the petition appears to request relief only with regard to the allegations of unfair labor practices under § 8(a)(5). *See id.* at 10–11. The Court accordingly construes the amended petition as asserting a claim to relief solely under § 8(a)(5). In any event, to the extent the Director intended to request relief based upon allegations relating to § 8(a)(1), this request has been waived because the Director advanced no arguments in support of a such a request in his post-hearing brief. *See, e.g.*, *M.G. Skinner & Assocs. Ins. Agency, Inc. v. Norman-Spencer Agency, Inc.*, 845 F.3d 313, 321 (7th Cir. 2017) ("Perfunctory and undeveloped arguments are waived, as are arguments unsupported by legal authority.").

the petition for preliminary injunction. Resp't's Mot. Summ. J., ECF No. 39. The Court entered and continued Advocate's motion for summary judgment, deferring consideration of the motion until after the hearing. *See* Minute Order of 3/21/17, ECF No. 43.

During the hearing, the Court heard testimony from Union organizers Dan Shansky and Brock Meade. Shansky testified that, after Advocate refused to bargain with the Union, he made about one hundred in-person visits to the clinics in the Walgreens stores and placed numerous phone calls to APNs in an attempt to educate the APNs about the Union's status. Hr'g Tr. at 10, 21–22. In general, the majority of the APNs that Shansky spoke with expressed an interest in attending Union meetings, *id.* at 135, and, in fact, attendance at Union meetings began to increase, *id.* at 285. On about six to twelve occasions, however, APNs appeared to be fearful about speaking with Shansky. *Id.* at 22. And, on approximately six occasions, APNs refused to speak with him entirely. *Id.* Although these APNs did not always explain their reasons for refusing to speak with Shansky, some of them explained that they didn't want to speak with him because they thought they were not "supposed to talk [to him]" in the clinics where they worked. *Id.* at 48.[5] Shansky also testified that Advocate's refusal to bargain has had an "increasingly negative effect" on the Union and its members, because the Union has been unable to negotiate with Advocate about workplace issues. *See id.* at 24–25. In addition, Shansky testified that the

---

[5] It is well established that hearsay testimony is admissible in preliminary injunction hearings. *See SEC v. Cherif*, 933 F.2d 403, 412 n.8 (7th Cir. 1991) ("[H]earsay can be considered in entering a preliminary injunction."); *FTC v. Lifewatch Inc.*, 176 F. Supp. 3d 757, 761–62 (N.D. Ill. 2016) ("Settled law . . . permit[s] a district court to consider hearsay at the preliminary injunction stage."); *see also Mullins v. City of New York*, 626 F.3d 47, 52 (2d Cir. 2010) ("[H]earsay evidence may be considered by a district court in determining whether to grant a preliminary injunction."). In any event, Advocate did not object to the portions of Shansky's or Meade's testimony cited herein regarding the APNs' statements to them. And the Court finds this hearsay testimony to be largely reliable based upon the nature of the testimony, the circumstances in which the statements were made, as well as Shansky's and Meade's demeanor on the witness stand.

Union has been unable to file grievances on behalf of its members or represent them in disciplinary hearings. *Id.* at 53, 170–72.

For his part, Meade testified that, after Advocate refused to recognize the Union, he also made clinic visits, placed phone calls, held meetings, and sent e-mails to make sure the APNs in the bargaining unit knew that the Union still represented them. *Id.* at 222. In the course of making these outreach efforts, Meade found that some APNs were confused about the Union's status. For example, Meade testified about several specific occasions throughout late July and early August 2016 in which he spoke with APNs who believed that the Union no longer existed or no longer represented them. *Id.* at 240–46. Moreover, some APNs seemed afraid to speak with Meade when he visited the clinics. *Id.* at 237, 243–44. Meade testified that one particular APN told him she was afraid that her manager would walk in on their conversation. *Id.* at 243–44. Finally, Meade confirmed that the Union has been unable to negotiate or file grievances on behalf of its members as a result of Advocate's refusal to recognize or bargain with the Union. *Id.* at 265–66.

Two APNs, Andrea Fuller and Kathleen Chambers, also testified at the hearing. Fuller and Chambers had worked at clinics in Walgreens stores prior to May 2016 as employees of Take Care Health and, thereafter, as employees of Advocate. *Id.* at 55–56, 174. Fuller testified that, in the months after the transition to Advocate, she had believed that the Union was "trying" to represent her and the other APNs in the bargaining unit, but that the Union was not, in fact, their representative, because it had no collective-bargaining agreement with Advocate. *Id.* at 62. Chambers similarly testified that, during the same period, she had been confused about the Union's status and was unsure whether the APNs in the bargaining unit were still represented by the Union. *Id.* at 193–94. She further testified that, if Advocate had been willing to bargain with the Union, she would have wanted the Union to negotiate with Advocate regarding working

conditions such as employee evaluations, the lack of medical assistants in the clinics, and requirements regarding certain computer programs that the APNs used. *Id.* at 202, 205–06. In addition, Chambers confirmed that the Union has been unable to negotiate on its members' behalf or represent its members in disciplinary hearings as a result of Advocate's refusal to recognize the Union. *Id.* at 206. The Union members thus are currently at-will employees who Advocate can discipline or fire for any reason. *Id.*

Last, the Court heard testimony from Matthew Pattelli, the Vice President of Human Resources for Advocate's support centers. *Id.* at 376. Prior to December 2016, Pattelli worked as Advocate's Director of Human Resources. *Id.* at 377. Pattelli testified about the structure of Advocate's medical services network, as well as the various services it provides. *Id.* at 378–79. He also testified about Advocate's system of evaluating APNs for pay raises using patient satisfaction surveys and various performance metrics. *See id.* at 381–91, 400–02. Finally, he testified that, prior to starting its operation of the clinics in the Walgreens stores, Advocate had made plans to start seeing patients as young as six months at the clinics, even though the Take Care Health clinics had seen patients only as young as eighteen months. *See id.* at 409, 417. Despite these plans, Advocate began to take patients as young as twelve months starting only in March or April 2017, and it still has not implemented its plans to start seeing patients as young as six months. *Id.* at 64, 196–97.

After the preliminary injunction hearing, Advocate filed a motion asking the Court to take judicial notice of certain information on the NLRB's website pursuant to Federal Rule of Evidence 201. *See* Resp't's Mot. Judicial Notice, ECF No. 76. The Court advised the parties that it would take the motion under consideration along with the petition for preliminary injunction. Minute Order of 7/12/17, ECF No. 81.

## II.  Legal Standard

Section 10(j) of the National Labor Relations Act authorizes a district court to "order injunctive relief pending the [NLRB's] final disposition of an unfair labor practice claim." *Lineback v. Irving Ready-Mix, Inc.*, 653 F.3d 566, 569 (7th Cir. 2011); *see* 29 U.S.C. § 160(j). An injunction issued under § 10(j) is an "extraordinary remedy." *NLRB v. Electro-Voice, Inc.*, 83 F.3d 1559, 1566 (7th Cir. 1996) (quoting *Szabo v. P\*I\*E Nationwide, Inc.*, 878 F.2d 207, 209 (7th Cir. 1989)). Accordingly, relief under § 10(j) "should be granted 'only in those situations in which the effective enforcement of the NLRA is threatened by the delays inherent in the NLRB dispute resolution process.'" *Id.* (quoting *Szabo*, 878 F.2d at 209).

A district court may grant relief pursuant to § 10(j) only if the relief would be "just and proper." 29 U.S.C. § 160(j); *accord Irving Ready-Mix*, 653 F.3d at 569. Injunctive relief is "just and proper" under § 10(j) where: "(1) the Director has no adequate remedy at law; (2) the labor effort would face irreparable harm without interim relief, and the prospect of that harm outweighs any harm posed to the employer by the proposed injunction; (3) public harm would occur in the absence of interim relief; [and] (4) the Director has a reasonable likelihood of prevailing on the merits of his complaint." *Lineback v. Spurlino Materials, LLC*, 546 F.3d 491, 500 (7th Cir. 2008) (quoting *Bloedorn v. Francisco Foods, Inc.*, 276 F.3d 270, 286 (7th Cir. 2001)) (internal quotation marks omitted); *accord Harrell v. Am. Red Cross, Heart of Am. Blood Servs. Region*, 714 F.3d 553, 556 (7th Cir. 2013); *Irving Ready-Mix*, 653 F.3d at 570.

The Director bears the burden of establishing the first, third, and fourth of these elements by a preponderance of the evidence. *Spurlino*, 546 F.3d at 500 (citing *Bloedorn*, 276 F.3d at 286). By contrast, the element of irreparable harm is "evaluated on a sliding scale: [t]he better the Director's case on the merits, the less [his] burden to prove that the harm in delay would be

irreparable, and vice versa." *Id.* (citing *Bloedorn*, 276 F.3d at 286–87). Even under this sliding

scale analysis, however, the Director bears the burden of showing that he "surpass[es] the

'possibility' threshold into 'likelihood' on each prong." *Barker v. A.D. Conner Inc.*, 807 F.

Supp. 2d 707, 718 (N.D. Ill. 2011) (citing *Winter v. Nat. Res. Defense Council, Inc.*, 555 U.S. 7,

22 (2008)); *accord Ohr v. Arlington Metals Corp.*, 148 F. Supp. 3d 659, 673 (N.D. Ill. 2015).

### III.  Analysis

The Director has petitioned the Court for injunctive relief, arguing that he has satisfied all

four requirements to show that relief is "just and proper" under § 10(j) and asking the Court for a

preliminary injunction to enjoin Advocate from engaging in unfair labor practices under

§ 8(a)(5).  For its part, Advocate opposes the petition, and it has moved for summary judgment

as to the claims for relief requested therein.  In addition, Advocate has filed a motion asking the

Court to take judicial notice of the NLRB's website in the course of ruling on the petition.  The

Court will discuss the merits of the Director's petition before turning to address Advocate's

motions.

### A.      Irreparable Harm and No Adequate Remedy at Law

First, the Director argues that the Court should grant the petition for injunctive relief

because the Union and its members will otherwise face irreparable harm and have no adequate

remedy at law.  "Prior cases in this circuit indicate that the irreparable harm and no adequate

remedy at law inquiries are intertwined." *Lineback v. Frye Elec., Inc.*, 539 F. Supp. 2d 1111,

1121 (S.D. Ind. 2008) (collecting cases); *see, e.g.*, *Bloedorn*, 276 F.3d at 297–300; *Electro-*

*Voice*, 83 F.3d at 1572–73.  In undertaking these inquiries, a court "must consider whether, in the

absence of the relief that the Director has requested, the right of [ ] workers to organize, and to

reap the benefits of collective bargaining, will be irreparably undermined" in a way that

monetary damages alone cannot remedy. *Bloedorn*, 276 F.3d at 297; *accord Electro-Voice*, 83

F.3d at 1567. "The court's mission is to determine whether the harm to organizational efforts that will occur while the [NLRB] considers the case is so great as to permit persons violating the [National Labor Relations Act] to accomplish their unlawful objectives, rendering the [NLRB's] remedial powers ineffectual." *Electro-Voice*, 83 F.3d at 1567. In addition, courts must balance the harms to the union and its members against the harms that may be suffered by the employer if an injunction were to be granted. *See, e.g.*, *Irving Ready-Mix*, 653 F.3d at 570; *Electro-Voice*, 83 F.3d at 1567.

Where, as here, a new employer refuses to bargain with a union, the risk of irreparable harm to the union and its members is "well-recognized." *Bloedorn*, 276 F.3d at 298. This is because a union and the workers it represents find themselves "'in a peculiarly vulnerable position' in the transition from predecessor to successor." *Id.* (quoting *Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 39 (1987)). "If the employees find themselves in a new enterprise that substantially resembles the old, but without their chosen bargaining representative, they may well feel that their choice of a union is subject to the vagaries of an enterprise's transformation." *Fall River*, 482 U.S. at 39–40. In addition, "[h]aving the new employer refuse to bargain with the chosen representative of the employees who worked for the predecessor disrupts the employees' morale, deters their organizational activities, and discourages their membership in unions." *Bloedorn*, 276 F.3d at 298 (quoting *Fall River*, 482 U.S. at 49–50) (internal quotation marks and brackets omitted). As time passes, such harms become only more severe and irreversible. *See Spurlino*, 546 F.3d at 501 ("The deprivation to employees from the delay in bargaining and the diminution of union support is immeasurable. That loss, combined with the likelihood that the Board's ability to rectify the harm is diminishing

with time, equals a sufficient demonstration of irreparable harm." (quoting *Electro-Voice*, 83 F.3d at 1563)).

Here, ample evidence shows that these kinds of irreparable harms were present once Advocate took over operation of the Take Care Health clinics and refused to recognize or bargain with the Union. First, and most importantly, Advocate's refusal to bargain significantly impaired the Union members' ability to exercise their rights to representation through the Union. For example, Union organizers and members gave uncontroverted, credible testimony that, because Advocate has refused to recognize or bargain with the Union, the Union has been unable to bargain with Advocate over terms and conditions of employment or file grievances on behalf of its members. Hr'g Tr. at 53, 206, 265–66. The Union is also unable to represent its members in disciplinary meetings, and its members have become at-will employees who Advocate can fire for any reason. *Id.* at 170–72, 206. According to Shansky, one of the Union organizers, the Union's inability to negotiate on behalf of the bargaining unit has had an "increasingly negative effect" on the Union and its members, given that the members have been unable to turn to the Union as a resource in helping resolve various workplace issues. *See id.* at 24–25. Under Seventh Circuit precedent, this evidence is sufficient to show irreparable harm. *See Bloedorn*, 276 F.3d at 297–98 (reversing denial of § 10(j) petition for abuse of discretion and holding that the Director had established irreparable harm where a successor employer refused to bargain with a union, even though the Director "put on no evidence of irreparable harm" before the district court).[6]

---

[6]     In arguing that the Director's evidence is insufficient to show irreparable harm, Advocate relies largely upon case law from other circuits. *See* Resp't's Br. at 14, ECF No. 71 (citing *McKinney v. S. Bakeries LLC*, 786 F.3d 1119, 1125 (8th Cir. 2015); *McKinney v. Creative Vision Res., L.L.C.*, 783 F.3d 293, 300 (5th Cir. 2015); *Muffley v. Spartan Mining Co.*, 570 F.3d 534, 546 (4th Cir. 2009)). This Court, of course, is bound to follow the Seventh Circuit's precedents in this area, and Advocate's reliance upon these out-of-circuit authorities thus is unavailing.

Moreover, Advocate's refusal to recognize or bargain with the Union hindered the organizational activities of the Union and its members by causing fear and confusion among some of the APNs. Meade, another Union organizer, testified that some of the APNs expressed fear about discussing Union activities and refused to speak with him. Hr'g Tr. at 237. One of these APNs specifically told Meade that she refused to speak with him in the clinic where she worked because "she was fearful of her manager coming in on the conversation." *Id.* at 243. Shansky similarly testified that employees expressed concerns to him about whether they were allowed to speak to him at the clinics. *Id.* at 22, 48. On some occasions, APNs refused to speak to him because of these concerns. *Id.* at 22.

The evidence further shows that some APNs were confused about whether the Union still represented them once Advocate took over. For example, after Advocate sent an e-mail to its APNs on May 19, 2016, to explain that it was refusing to recognize the Union, one APN asked the Union to cancel her membership because the APNs were now "fully transitioned" to Advocate. *Id.* at 17–18.[7] In addition, one of the members testified that, in the months following the transition to Advocate, she believed that the Union did not represent her because it had no collective-bargaining agreement with Advocate. *Id.* at 6. Meade also testified about several specific clinic visits and phone calls during July and August 2016 in which members expressed confusion to him about whether they were still members or whether the Union still existed. *Id.* at 241–47. Both Meade and Shansky testified that they spent much of their time during the summer of 2016 working to counteract this confusion, making about one hundred in-person

---

[7]     Advocate argues that this evidence does not show irreparable harm because the APNs were still represented by the Union despite any such attempts to "cancel" their membership. *See* Resp't's Br. at 23. The point here, however, is not that any APNs in fact canceled their membership; it is that an APN attempted to cancel her membership in light of her confusion regarding the Union's status after the transition to Advocate.

clinic visits and placing numerous phone calls in an effort to speak with Union members about the Union's status. *Id.* at 12–13, 21–22, 226, 240–46.

Taken all together, this evidence shows that, after Advocate began its operation of the clinics and refused to bargain with the Union, some of the APNs who worked at the clinics were unwilling to participate in the Union's organizing efforts or were unsure whether the Union was still their representative. In light of Advocate's e-mail to the APNs on May 19, 2016, announcing its refusal to bargain, it is reasonable to infer that Advocate's refusal fueled this unwillingness and uncertainty. *See* GC Admin. Ex. 5. More importantly, as noted above, the Union, without a seat at the bargaining table with Advocate, was unable to negotiate on behalf of its members or otherwise represent them. Such evidence is more than enough to establish irreparable harm to the Union and its members. *See, e.g.*, *Bloedorn*, 276 F.3d at 297–98; *Electro-Voice*, 83 F.3d at 1572–73 (finding irreparable harm where evidence showed that employer's conduct had a chilling effect on employees' efforts to organize).[8]

What is more, monetary damages or an eventual remedial order by the NLRB will not be adequate to cure these harms. The ALJ has not yet issued a decision in the administrative proceeding, and, even after the ALJ issues her decision, the NLRB may still take months or years to arrive at a final resolution of this case. *See, e.g.*, *Irving Ready-Mix*, 653 F.3d at 570 (noting

---

[8]     Advocate makes a barrage of arguments in an attempt to persuade the Court that the record shows no evidence of irreparable harm. For example, Advocate argues that any participation in the Union's activities predated Advocate's takeover, that the Union's organizing activities have become only more robust and successful under Advocate, and that ambiguous communications from the Union itself caused its members' confusion regarding the Union's status. *See* Resp't's Br. at 15–27. What these arguments ignore, however, is that Advocate's refusal to recognize or bargain with the Union caused irreparable harm in and of itself. The Union members' bargaining rights would have been more meaningfully exercisable, their organizational activities likely more robust, and their morale more positive if Advocate had not refused to recognize or bargain with the Union. Considered in that light, the evidence discussed above is sufficient to show that Advocate's refusal to bargain has caused irreparable harm to the Union and its members under Seventh Circuit precedent. *See, e.g.*, *Bloedorn*, 276 F.3d at 297–98.

the "'notoriously glacial' pace of [NLRB] proceedings" (quoting *Kinney v. Pioneer Press*, 881

F.2d 485, 491 (7th Cir. 1989))).  As time progresses, the harms flowing from Advocate's refusal

to bargain with the Union will become only increasingly significant and incurable.  *See Spurlino*,

546 F.3d at 501; *Electro-Voice*, 83 F.3d at 1563.  For these reasons, after carefully considering

and weighing the evidence presented during the evidentiary hearing, the Court concludes that the

Director has made a strong showing that the Union and its members have suffered irreparable

harms for which there is no adequate remedy at law.

Importantly, any harm to Advocate that would result from a grant of injunctive relief

would not outweigh the harms that the Union and its members would continue to endure in the

absence of such relief.  Advocate asks the Court to conclude otherwise, arguing that a

preliminary injunction would cause it irreparable harm because it would "force[ ] Advocate to

recognize and bargain with the Union in a bargaining unit that is inappropriate at Advocate

and/or lacks the majority support of its members."  Resp't's Br. at 33.  This argument is

unpersuasive.  First, the argument assumes as a foregone conclusion that the bargaining unit is

"inappropriate" and that the Union "lacks majority support" within the unit.  Both of these

issues, however, are disputed matters that speak to the merits of the Director's administrative

complaint, rather than the issue of irreparable harm.[9]  Moreover, while there is a possibility that

the NLRB will ultimately rule against the Director on the merits, this is a possibility that exists in

every case involving a request for injunctive relief pursuant to § 10(j).  A version of Advocate's

argument is thus available to respondents in every § 10(j) proceeding, and to credit this argument

as a basis for finding no irreparable harm would effectively render § 10(j) a nullity.

---

[9]     The Court will address the issues of the bargaining unit's appropriateness and the Union's
majority support below, in the course of discussing whether the Director has a reasonable likelihood of
success on the merits.

Advocate also argues that a grant of injunctive relief would harm it by forcing Advocate to share confidential proprietary information in its negotiations with the Union. *Id.* This argument, too, is unavailing. Advocate has not offered any evidence to support its claim that bargaining with the Union would cause this type of harm. Nor has it cited any case law in which a court took this type of harm into consideration absent evidence suggesting that the harm might, in fact, occur. *See id.*

For all of these reasons, the Court finds based upon the factual record that the Director has made a strong showing of irreparable harm to the Union and its members. The evidence further shows that there is no adequate remedy at law to redress this harm, and that this harm outweighs any potential harm to Advocate.

**B.      Likelihood of Success on the Merits**

Next, the Court considers whether the Director has a reasonable likelihood of success on the merits in the underlying administrative proceeding. In considering the likelihood of success on the merits, "it is not the district court's responsibility . . . to rule on the merits of the Director's complaint." *Bloedorn*, 276 F.3d at 287. Rather, the court must confine its inquiry to "the *probability* that the Director will prevail" in the administrative proceeding. *Id.* (citing *Electro-Voice*, 83 F.3d at 1570). In other words, "[a]ssessing the Director's likelihood of success calls for a predictive judgment about what the [NLRB] is likely to do with the case." *Id.* at 288. A court can find a likelihood of success on the merits where it determines that the Director has a "better than negligible chance of success." *Spurlino*, 546 F.3d at 502 (citing *Electro-Voice*, 83 F.3d at 1568).

Here, the Director argues that he has a likelihood of success on the merits in the administrative proceeding with regard to his claim that Advocate violated § 8(a)(5) of the National Labor Relations Act by refusing to bargain with the Union as the successor employer to

Take Care Health. Section 8(a)(5) provides that, in general, an employer commits an unfair labor practice when it "refuse[s] to bargain collectively with the representatives of [its] employees." 29 U.S.C. § 158(a)(5). An employer must engage in collective bargaining with a union if it is a "successor employer" with regard to the employees whom the union represents. *See Fall River*, 482 U.S. at 41; *see also NLRB v. Burns Int'l Sec. Servs., Inc.*, 406 U.S. 272, 280–81 (1972). An employer qualifies as a "successor employer" where: (1) there is "substantial continuity" between the business enterprises of the employer and its predecessor; (2) the unit of employees comprising the employer's business operation remains an appropriate unit for collective bargaining; and (3) a majority of the employer's employees in the unit were previously employed by the predecessor. *See Shares, Inc. v. NLRB*, 433 F.3d 939, 943 (7th Cir. 2006) (citing *Fall River*, 482 U.S. at 43, 46–47).

Here, the parties do not dispute that Advocate has refused to recognize and bargain with the Union. Rather, they dispute whether Advocate qualifies as a "successor employer" such that this refusal amounted to a violation of § 8(a)(5). For the reasons explained below, the Court concludes that the Director has a reasonable likelihood of success in proving to the NLRB that Advocate qualifies as a successor employer and thus violated § 8(a)(5).

## 1. Substantial Continuity

First, to prove that a new employer is a "successor employer" with an obligation to bargain with a union, the Director must show "substantial continuity" between the business enterprises of the new employer and its predecessor. *Id.* (citing *Fall River*, 482 U.S. at 43, 46–47). The determination of whether there is "substantial continuity" between a new employer's and predecessor employer's respective business enterprises is a fact-intensive inquiry dependent upon the totality of the circumstances. *Fall River*, 482 U.S. at 43. In making this inquiry, the

19

NLRB considers factors such as "whether the business of both employers is essentially the same; whether the employees of the new company are doing the same jobs in the same working conditions under the same supervisors; and whether the new entity has the same production process, produces the same products, and basically has the same body of customers." *Bloedorn*, 276 F.3d at 289 (quoting *Fall River*, 482 U.S. at 43). The NLRB considers these factors from the perspective of the employees, asking whether "those employees who have been retained will understandably view their job situations as essentially unaltered." *Fall River*, 482 U.S. at 43.

The administrative record contains ample evidence that there was substantial continuity between the business enterprises of Advocate and its predecessor, Take Care Health. First, all of the APNs who testified at the administrative hearing stated that their job responsibilities for Advocate were the same as their job responsibilities for Take Care Health. For example, when asked whether the work she did for Advocate was different from the work she did for Take Care Health, APN Julie Darley answered: "I am doing the same work. I'm seeing the same people. I am doing the same physicals. I am doing the same sick visits." Admin. Tr. at 147–48. Other APNs gave similar testimony, explaining that they performed the same kinds of nursing tasks— that is, seeing sick patients, performing wellness exams, and administering vaccines—for Advocate as they had performed for Take Care Health. *Id.* at 172, 298–99, 364, 374, 459. In addition, Advocate's Vice President of Nursing, Pamela Smith, confirmed that the APNs have the same substantive nursing responsibilities as employees of Advocate as they had when they were employees of Take Care Health. *Id.* at 696–98. One change to the APNs' nursing responsibilities that Advocate plans to implement is to allow the APNs to start seeing patients as young as six months, rather than allowing them to see patients only eighteen months and older.

*See id.* at 409, 417. But this change had not yet been fully implemented as of the time of the preliminary injunction hearing. *See* Hr'g Tr. at 64, 196–97.

The APNs also testified that many of their working conditions under Advocate remained the same as their working conditions under Take Care Health. Some of the equipment in the clinics was replaced, such as signs, computers, printers, scanners, telephones, and scales. Admin. Tr. at 136–37, 281–82. But much of the equipment and furniture that had been used by Take Care Health remained in the clinics once Advocate took over. This equipment and furniture included all of the chairs, exam tables, thermometers, refrigerators, biohazard bins, ear scopes, eye scopes, desks, glove dispensers, medications, supplies, and keys. *Id.* at 137–38, 282–83. In addition, the hours that the APNs worked did not change under Advocate's management. *Id.* at 145–46, 283, 439–41. And, although the APNs' supervisors changed once Advocate took over, *see id.* at 546–49, 560, the APNs testified that the style and frequency of supervision remained the same, in that they had minimal interaction with their supervisors under Advocate, just as they had had minimal interaction with their supervisors under Take Care Health, *id.* at 146–47, 283–84, 357, 446–47.

Where, as here, the evidence shows that a new employer provided the same services in the same location as the predecessor and used most of the same equipment, the NLRB has previously found substantial continuity between the predecessor and the new employer. *See, e.g.*, *Sprain Brook Manor Rehab, LLC*, 365 NLRB No. 45, slip op. at 36 (Mar. 21, 2017) (finding substantial continuity between an employer and its predecessor where the employer provided the same healthcare services as the predecessor and "its employees continue[d] to perform the same patient care duties with the same equipment and materials"); *Cmty. Hosps. of Cent. Cal.*, 335 NLRB 1318, 1332 (2001) (finding substantial continuity between an employer and its

predecessor where the employer operated an acute-care health facility in the same location as the predecessor, used "essentially the same equipment," kept the same general pool of patients, and had no interruption in services). The Court therefore concludes that, given the evidence presented at the administrative hearing, the Director has a reasonable likelihood of success in persuading the NLRB that there was substantial continuity between Take Care Health's and Advocate's operation of the clinics. *Cf. Bloedorn*, 276 F.3d at 289–90 (finding it "highly likely" that the Director could prove substantial continuity, even where the administrative record revealed changes in employee training, job descriptions, and equipment).

In asking the Court to conclude otherwise, Advocate's sole argument is that its business operations should be compared to the business operations of Walgreens, rather than Take Care Health. In support, it argues that Walgreens and Take Care Health "were so functionally integrated as to constitute a single employer and/or alter egos." Resp't's Br. at 9 & n.1; *see also* Resp't's Admin. Br. at 53–61, ECF No. 37. This is a creative application of the single employer and alter ego doctrines, but one lacking a firm basis in NLRB precedent. Indeed, both doctrines are typically used in NLRB decisions to determine whether a respondent (which claims to be a third-party) is, in actuality, an employer of the workers at issue and, thereby, bound by the requirements of the National Labor Relations Act. And Advocate has not offered a single NLRB decision that has utilized these doctrines in the manner that Advocate attempts here.

First, "[t]he single employer doctrine is [an NLRB] creation that treats two or more related enterprises as a single employer for purposes of holding the enterprises jointly . . . liab[le] for any unfair labor practices." *NLRB v. Bolivar-Tees, Inc.*, 551 F.3d 722, 727 n.2 (8th Cir. 2008) (quoting *Iowa Express Distrib., Inc. v. NLRB*, 739 F.2d 1305, 1310 (8th Cir. 1984)). Indeed, in every NLRB decision that Advocate cited in its administrative brief in support of its

single employer theory, the NLRB used this doctrine to impose legal obligations on a respondent-employer—not to redefine the identity of a predecessor employer for purposes of a substantial-continuity analysis, as Advocate urges here. *See* Resp't's Admin. Br. at 53–61 (citing *David Saxe Prods.*, 364 NLRB No. 100, slip op. (Aug. 26, 2016); *Oliva Supermarkets LLC*, 363 NLRB No. 170, slip op. (Apr. 28, 2016); *Distler Corp.*, 363 NLRB No. 18, slip op. (Sept. 30, 2015); *Rogan Bros. Sanitation, Inc.*, 362 NLRB No. 61, slip op. (Apr. 8, 2015); *Massey Energy Co.*, 358 NLRB 1643 (2012); *Masland Indus.*, 311 NLRB 184 (1993)).

Similarly, the alter ego doctrine is traditionally used to determine whether a respondent is subject to liability as the alter ego of a nominally separate entity accused of engaging in unfair labor practices. *See, e.g.*, *Oliva*, 363 NLRB No. 170, slip op. at 14–18; *Diverse Steel, Inc.*, 349 NLRB 946, 946–47 (2007). In considering whether one entity is the alter ego of another, the NLRB "considers whether the purpose behind the creation of the alleged alter ego was to evade responsibilities under the [National Labor Relations Act]." *Diverse Steel*, 349 NLRB at 946; *see also Int'l Union of Operating Eng'rs, Local 150, AFL-CIO v. Centor Contractors, Inc.*, 831 F.2d 1309, 1312–13 (7th Cir. 1987) (noting in labor union case that "[u]nlawful motive [and] intent are critical inquiries in an alter ego analysis"). Given this focus on evasion of legal obligations, the alter ego doctrine generally serves the purpose of preventing a respondent from avoiding liability under the Act, rather than enabling a respondent to avoid liability by redefining a predecessor employer under a substantial-continuity inquiry. *See, e.g.*, *Diverse Steel*, 349 NLRB at 946. Again, Advocate cites no precedent to the contrary.

There are several reasons why the NLRB might decline to adopt Advocate's invitation to apply the single employer and alter ego doctrines in the manner Advocate has proposed. First, as noted above, Advocate cited no precedent in its administrative brief in which the NLRB or a

court had applied these doctrines to determine which entity to treat as a predecessor employer in a substantial-continuity analysis. Indeed, such application of these doctrines appears to be contrary to the doctrines' usual purpose and effect, which is to expand the reach of employers' liability under the National Labor Relations Act. *See, e.g.*, *Oliva*, 363 NLRB No. 170, slip op. at 14–18; *Diverse Steel*, 349 NLRB at 946–47. In addition, applying these doctrines to the substantial-continuity analysis in the manner Advocate proposes would be difficult to reconcile with the long-standing rule that the substantial-continuity analysis must be undertaken from the perspective of the employees at issue. *See Fall River*, 482 U.S. at 43. Here, for example, direct testimony from the APNs showed that they considered their employer to be Take Care Health. *See* Admin. Tr. at 117, 261–62, 336, 406–07, 426, 1128. To apply the single employer or alter ego doctrine so as to conclude that the APNs' predecessor employer was not, in fact, Take Care Health would run counter to the well-established principle that the employees' perspective dominates the substantial-continuity analysis. Finally, in the administrative proceeding, the ALJ denied Advocate's motion to dismiss the Director's complaint after the Director rested his case, noting that the Director had made a *prima facie* showing in support of his claims. *Id.* at 501. This suggests that the ALJ thought the Director's case had some merit, and that she may continue to think so even in the face of Advocate's single employer and alter ego theories. *See Bloedorn*, 276 F.3d at 288 ("The ALJ is the [NLRB's] first-level decisionmaker. Having presided over the merits hearing, the ALJ's factual and legal determinations supply a useful benchmark against which the Director's prospects of success may be weighed.").

To be clear, this is not to say that the single employer and alter ego doctrines could never be applied in the manner that Advocate has argued. But it is not this Court's role to decide the merits of the parties' arguments in the underlying administrative case. *See id.* at 287. Rather,

the Court's inquiry is circumscribed to making "a predictive judgment about what the [NLRB] is likely to do with the case." *Id.* at 288. Here, it suffices to say that, given Advocate's reliance upon a novel application of these doctrines, the lack of direct support for such an application in the NLRB's precedents, and the reasons for which the NLRB might not be persuaded to accept this application, Advocate's single employer and alter ego theories do not significantly undermine the Director's likelihood of success on the merits. Instead, the Director has, at the very least, a "better than negligible" likelihood of success in prevailing on the merits of the substantial-continuity inquiry. *Spurlino*, 546 F.3d at 502.

## 2. Appropriateness of the Bargaining Unit

The next factor in determining whether a new employer is a successor employer with a duty to bargain under § 8(a)(5) is whether the unit of employees in the new employer's business operation remains the appropriate unit for collective bargaining. *Shares*, 433 F.3d at 943 (citing *Fall River*, 482 U.S. at 43, 46–47).

As noted above, in 2011, the NLRB certified the Union as the exclusive representative of a bargaining unit consisting of all APNs employed by Take Care Health in the fifty-six Take Care Health clinics in the Chicagoland area. *See* GC Admin. Ex. 3. The parties dispute whether this bargaining unit remains appropriate now that Advocate has taken over operation of the clinics. *See* Pet'r's Br. at 7–8; Resp't's Br. at 10–12.[10]

An employer may withdraw recognition of a union without running afoul of § 8(a)(5) where a bargaining unit is combined with similar employees such that the members of the unit no

---

[10] Relatedly, the parties also dispute whether a historical bargaining unit is entitled to a presumption of appropriateness where, as here, the members of the unit become part of a larger group of employees working under the same employer. *Compare* Pet'r's Br. at 8, *and* Pet'r's Admin. Br. at 7, *with* Resp't's Br. at 10–13, *and* Resp't's Admin. Br. at 113–16. For the reasons explained below, however, the Director has a reasonable likelihood of success on the merits even without the benefit of such a presumption. The Court therefore need not address this dispute further.

longer constitute a "community of interest" having "a distinct identity from the larger group of employees." *Dodge of Naperville, Inc.*, 357 NLRB 2252, 2253 (2012) (citing *Serramonte Oldsmobile, Inc.*, 318 NLRB 80, 104 (1995)), *enforced*, 796 F.3d 31 (D.C. Cir. 2015). To determine whether a bargaining unit forms a distinct "community of interest," the NLRB considers factors such as whether the employees in the unit and the other, non-unit employees work side by side, as well as whether they share the same supervisors, terms and conditions of employment, uniforms, work assignments, skill sets, training, and job functions. *See id.*; *Specialty Healthcare & Rehab. Ctr. of Mobile*, 357 NLRB 934, 942 (2011); *see also FedEx Freight, Inc. v. NLRB*, 839 F.3d 636, 637–38 (7th Cir. 2016). The balancing of these factors is a fact-intensive inquiry, and no single factor is dispositive. *See, e.g.*, *United Food & Commercial Workers, AFL-CIO v. NLRB*, 519 F.3d 490, 494 (D.C. Cir. 2008).

Prior to May 2016, Advocate employed approximately 220 APNs in its various medical practice sites in Illinois. Admin. Tr. at 878–79. Advocate then hired an additional 143 APNs to staff the clinics that had formerly been operated by Take Care Health, bringing its total number of APNs to over 350. *Id.*; Joint Admin. Ex. 4. Several pieces of evidence indicate that the 143 APNs working in the clinics formerly operated by Take Care Health form a community of interest that sets them apart from the other APNs that Advocate employs.

First, generally speaking, the APNs working in the clinics at the Walgreens stores work in locations that are separate from the other APNs. *See, e.g.*, Admin. Tr. at 160–61, 291–92, 365–67, 456–57. The one exception is that the APNs in these clinics are permitted to cover some shifts in Advocate's Immediate Care Clinics and family practice sites, where they work alongside some of Advocate's other APNs. *See id.* at 162, 594. As of the time of the administrative hearing, however, only 9 of the 143 APNs who were employed at the clinics (that

is, approximately 6%) had ever taken shifts at an Immediate Care Clinic, and only 4 of the 143 APNs (that is, approximately 3%) had ever taken shifts at a family practice site. *See* Pet'r's Br. at 18–19 (citing Resp't's Admin. Ex. 26). Furthermore, the evidence shows that the APNs in the clinics at Walgreens had distinct job responsibilities and training as compared to Advocate's other APNs. Specifically, APNs who were employed at the clinics uniformly testified that they had neither received training to work at Advocate's hospitals, medical groups, family practice sites, or at-work sites, nor ever interacted with the APNs who worked at those locations. Admin. Tr. at 160–61, 291–92, 365–67, 456–58. Advocate's Chief Operating Officer, Donna Cooper, confirmed that the APNs working at the clinics in the Walgreens stores had received no such training. *Id.* at 595–97.

For its part, Advocate argues that the APNs in its Walgreens clinics are indistinguishable from the other APNs it employs. In support, it points to evidence that both sets of APNs share common supervisors, receive similar safety training, are subject to the same compensation and employment policies, and wear the same Advocate-branded lab coats. *See id.* at 546–49, 575–76, 655–56, 802–03, 947–55. It also argues that both sets of APNs have similar job responsibilities, at least when framed at a broad level of generality, in that they share licensing and educational backgrounds and both treat patients. Resp't's Br. at 11; *see* Admin. Tr. at 118–20, 627–29, 655–56.

On balance, the Court finds that the Director has a better than negligible likelihood of success with respect to this issue. It is true that some relevant factors weigh against the Director's position—most notably, Advocate has offered evidence that all of its APNs had the same supervisors, the same terms and conditions of employment, and the same uniforms. *See Dodge of Naperville*, 357 NLRB at 2253 (noting that such factors are relevant to the

community-of-interest analysis).  But other evidence cuts in the Director's favor.  As noted above, the vast majority of APNs who were employed at the clinics were isolated from Advocate's other APNs, having no interactions with them and working at distinct locations. Admin. Tr. at 160–61, 291–92, 365–67, 456–58.  In addition, there is evidence in the record that the APNs who worked at the clinics provided medical services that differed from the services offered at Advocate's other locations, and these APNs received no training that qualified them to work at those other locations.  *See id.*  This evidence weighs in favor of a finding that that these APNs formed a distinct community of interest.  *See, e.g.*, *Dodge of Naperville*, 357 NLRB at 2253; *Specialty Healthcare*, 357 NLRB at 942.  Finally, although a small percentage of APNs sometimes worked outside the clinics at the Immediate Care Clinics or the family practice sites, such "sporadic instances" of interchange to Advocate's other work sites is likely insufficient to render the bargaining unit inappropriate.  *United Operations, Inc.*, 338 NLRB 123, 125 (2002) (noting that "sporadic instances of employees' assisting with another department's tasks" do not reflect an "overlap of job functions" for purposes of a community-of-interest inquiry).

In sum, the Director's evidence is sufficient to support a finding by the NLRB that the APNs who worked at the clinics in the Walgreens stores formed a distinct community of interest within the larger group of APNs employed by Advocate.  *See Dodge of Naperville*, 357 NLRB at 2253; *Specialty Healthcare*, 357 NLRB at 942.  Further signaling the Director's likelihood of success as to this issue is the fact that, as noted above, the ALJ denied Advocate's motion to dismiss the Director's complaint, on the ground that the Director had made a *prima facie* showing to support his claims.  Admin. Tr. at 501; *see Bloedorn*, 276 F.3d at 288.  For these reasons, in light of the evidence and the arguments that the parties presented in the administrative

proceeding, the Court concludes that the Director has a better than negligible chance of success in convincing the NLRB that the APNs in the bargaining unit form a distinct community of interest and that the bargaining unit certified in 2011 remains appropriate.

### 3. Majority of Employees

The last factor that must be considered in deciding whether an employer is a successor employer for purposes of § 8(a)(5) is whether a majority of the employer's employees in the appropriate bargaining unit were previously employed by its predecessor. *See, e.g.*, *CNN America, Inc.*, 361 NLRB No. 47, slip op. at 23 (2014) (citing *Fall River*, 482 U.S. at 41); *Shares*, 433 F.3d at 943. Here, the parties stipulated in the administrative proceeding that, "[a]s of May 14, 2016, Take Care Health Illinois P.C. employed 165 APNs in the clinics inside Walgreens stores in Illinois." Joint Admin. Ex. 4. They also stipulated that, "[a]s of May 16, 2016, Advocate . . . hired 143 of the above 165 APNs" to work in these clinics. *Id.* No other APNs were hired to work in the clinics. *See* Admin. Tr. at 895 (noting that Advocate hired a total of 143 APNs).[11] Furthermore, the parties stipulated that, "at the time [Advocate] leased the Clinics and began operation of the Clinics, the majority of APNs hired and put to work at the Clinics were formerly employed by Take Care Health." Joint Admin. Ex. 1 ¶ 2, ECF No. 27. Given these stipulations, the Director has an exceptionally strong likelihood of success in proving that a majority (indeed, the entirety) of Advocate's newly hired workforce in the clinics

---

[11]     In his brief, the Director states that "[Advocate] stipulated that it hired 143 of its 165 APNs to work in the Clinics from [Take Care Health]." Pet'r's Br. at 3 (citing Joint Admin. Exs. 1, 4). This assertion, however, appears to be an inadvertent mischaracterization of the parties' stipulations, which state not that Advocate hired 165 APNs, but instead that Advocate hired 143 of the 165 APNs that had formerly worked for Take Care Health. Joint Admin. Ex. 4.

in the Walgreens stores comprised APNs who had previously been employed by Advocate's predecessor, Take Care Health.[12]

Advocate nevertheless argues that the majority of the employees in the relevant bargaining unit were not, in fact, employed by Take Care Health. It reasons that the total number of employees in this bargaining unit is not 143 (*i.e.*, the number of APNs it hired to work in its clinics), but 350 (*i.e.*, the total number of APNs it employs across all of its medical services sites in the relevant counties). *See* Resp't's Br. at 5–6. In support, it claims that the petition filed in this case defines the bargaining unit as including "all" APNs employed by Advocate, and that "all" includes all 350 APNs. *Id.* Advocate made a similar argument before the ALJ, contending that both the Union's demand letter of May 17, 2016, and the Director's administrative complaint defined the relevant bargaining unit to include all 350 APNs—or at least defined the unit too vaguely for Advocate to know that the definition was meant to include only the 143 APNs employed in its clinics in the Walgreens stores. *See* Resp't's Admin. Br. at 80–85.[13]

These arguments do little to weaken the Director's strong likelihood of success on the merits as to this issue. First, the petition for preliminary injunction filed in the present case was not part of the evidentiary record in the administrative proceeding, and it thus is irrelevant to this

---

[12] Despite these stipulations, Advocate introduced evidence before the ALJ that only 123 of the 143 APNs it hired to work in the clinics were former employees of Take Care Health. *See* Admin. Tr. at 895. Even if the ALJ were to credit this evidence over the stipulations, however, the Director would still have a strong likelihood of success in proving that a majority (that is, 123 of 143) of Advocate's new hires had previously been employed by Take Care Health.

[13] Advocate also argues that any vagueness in the petition's definition of the relevant bargaining unit runs afoul of Federal Rule of Civil Procedure ("Rule") 65(d). *See* Resp't's Br. at 7. Rule 65(d), however, does not set forth a pleading standard for petitions for injunctive relief; rather, it governs injunction orders issued by a court, requiring such orders to "state [their] terms specifically" and "describe in reasonable detail . . . the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1); *see also Spurlino*, 546 F.3d at 503–06 (discussing the application of Rule 65(d) with respect to a preliminary injunction order issued pursuant to § 10(j)). Because no injunction order had yet been proposed or entered in this case, Advocate's arguments with regard to Rule 65(d) are premature.

Court's prediction of the Director's likelihood of success.  *See Harrell v. Nat'l Red Cross, Heart of Am. Blood Servs. Region*, No. 11-1284, 2011 WL 3951860, at *2 (C.D. Ill. Sept. 7, 2011) (noting that evidence not presented to the ALJ has no bearing on the Director's likelihood of success on the merits for purposes of a § 10(j) proceeding).

Second, contrary to Advocate's assertion, the Union's demand letter specified that the bargaining unit it sought to represent included only those employees who worked in the clinics formerly operated by Take Care Health.  For example, the demand letter asserted: "Advocate Medical Group is a successor employer of the Nurse Practitioners working *in the Take Care Health Clinics* located in Walgreens stores.  . . .  A majority of NPs working *in these facilities* were a recognized collective bargaining unit represented by Illinois Nurses Association."  GC Admin Ex. 2(a) (emphasis added).  It then demanded that Advocate recognize the Union "as the exclusive representative of all full-time and regular part-time nurse practitioners, including PRN nurse practitioners, *at Take Care Health Clinics* in [certain Illinois counties]."  *Id.* (emphasis added).  By including these statements, the letter made clear that the Union sought to represent only the 143 APNs who were working in the former Take Care Health clinics.

The Director's administrative complaint similarly makes repeated references to the Take Care Health clinics located in the Walgreens stores in the course of defining the relevant bargaining units under Take Care Health and Advocate.  *See, e.g.*, Admin. Compl. ¶ V(a) ("The following employees of respondent (the Take Care Health Unit) constitute a unit appropriate for the purposes of collective bargaining."); *id.* ¶ V(e) (defining the relevant bargaining unit under Advocate to include "[a]ll full-time and regular part-time nurse practitioners (NPs) including PRN nurse practitioners) who are regularly assigned to work at Walgreens clinics and Immediate

Care Clinics in [certain Illinois counties]");[14] *see also id.* ¶ V(c) ("From about June 14, 2011, to May 14, 2016, . . . the [Union] had been the exclusive collective-bargaining representative of the Take Care Health Unit employed by Take Care Health."); GC Admin. Ex. 1(k) ("Amendment to Compl.") ¶ V(c) ("Since about May 19, 2016, Respondent has failed and refused to recognize and bargain with the [Union] as the exclusive collective-bargaining representative of the Take Care Health Unit."). These repeated references to the Take Care Health clinics in the administrative complaint, just like the repeated references in the demand letter, belie Advocate's assertion that the definition of the bargaining unit in the administrative complaint would require the NLRB to conclude that the bargaining unit comprised all 350 APNs, rather than the subset of APNs working at the clinics in the Walgreens stores.

Finally, Advocate argues that, even assuming the relevant bargaining unit comprises only the 143 APNs that work in its clinics in the Walgreens stores, Advocate is not obligated to bargain with the Union, because the Union had only 11 members as of May 17, 2016, and thus was not supported by a majority of the bargaining unit. Resp't's Br. at 6. In its administrative brief, however, the only evidence that Advocate cited in support of this argument was an undated Internet post affiliated with a Facebook group called "Former Take Care Clinic Employees," in which an individual wrote: "[The Union] said they can bargain or have some kind of staying power to come back in cause [*sic*] 51 percent of all 11 members are going to advocate [*sic*] . . . . It doesn't really make sense to me." Resp't's Admin. Ex. 38; *see* Resp't's Admin. Br. at 116–

---

[14] In the administrative proceeding, the Director argued that, in the alternative to a bargaining unit consisting of only the 143 APNs working in the clinics in the Walgreens stores, an appropriate bargaining unit also could consist of these 143 APNs plus the 8 APNs working in the Immediate Care Clinics. *See* Pet'r's Admin. Br. at 3–4, 20–21; *see also* Joint Admin. Ex. 4 (stipulating that Advocate employed a total of 8 APNs in the Immediate Care Clinics as of May 16, 2016). Thus, under this alternative theory, the total number APNs in the bargaining unit would still be only approximately 151 APNs (143 plus 8), not 350 APNs, as Advocate argues.

29.[15]  The ALJ expressly declined to admit this Facebook post into evidence for the truth of the matters asserted therein, instead admitting it only to show the impression that the Facebook post had made on Pattelli, Advocate's Director of Human Resources.  Admin. Tr. at 976.  Given the limited purpose for which this evidence was admitted, as well as the lack of other evidence in support of Advocate's position,[16] the Court finds it unlikely that Advocate will persuade the NLRB that the Union lacked majority support.

In sum, the Director has a reasonable likelihood of success in proving to the NLRB that there is substantial continuity between the respective business enterprises of Advocate and its predecessor, that the unit of APNs working in the clinics formerly operated by Take Care Health remains an appropriate unit for collective bargaining, and that a majority of the employees working in these clinics were previously employed by Take Care Health.  In light of the Director's strong showing of irreparable harm, the Court therefore concludes under the sliding scale approach that the Director has met his burden of showing a reasonable likelihood of success on the merits of his claim that Advocate was a successor employer who violated § 8(a)(5) by refusing to recognize and bargain with the Union for the purposes of the present motion.  *See Fall River*, 482 U.S. at 41–47; *Spurlino*, 546 F.3d at 500.

---

[15]  In its brief before this Court, Advocate attempts to support this argument by citing not only the Facebook post presented to the ALJ, but also the Union's demand letter of May 17, 2016.  Resp't's Br. at 6 (citing Resp't's Ex. 57, ECF No. 72-61; GC Admin. Ex. 2(a)).  The demand letter, however, does not discuss the number of Union members as of May 17, 2016, or, for that matter, at any other point in time.  *See* GC Admin. Ex. 2(a).  It therefore lends no support for Advocate's argument.

[16]  It bears noting that Advocate attempted to develop additional evidence regarding Union membership during the evidentiary hearing held before this Court.  During the hearing, however, the testimony consistently showed that all 143 APNs in the clinics formerly operated by Take Care Health were members of the Union.  *See, e.g.*, Hr'g Tr. at 58–59, 167, 186–87.  Only a small percentage of those APNs paid Union dues, but the testimony further showed that an APN was required to pay dues only if he or she wished to be a voting member of the Union or serve in an official capacity, *see id.* at 269–70; dues were not required to be a member of the Union.  *See id.* at 58–59, 167, 186–87, 233–34; *see also* Resp't's Ex. 31, ECF No. 72-48.

## C.     Public Harm

Finally, the Court must consider whether a grant of interim relief under § 10(j) would be in the public interest. "[T]he interest at stake in a section 10(j) proceeding is the public interest in the integrity of the collective bargaining process." *Bloedorn*, 276 F.3d at 300 (internal quotation marks omitted). This public interest is "furthered, in part, by ensuring that an unfair labor practice will not succeed before the Board takes too long to investigate and adjudicate the charge." *Spurlino*, 546 F.3d at 502 (quoting *Electro-Voice*, 83 F.3d at 1574). By contrast, this public interest is "placed in jeopardy when the protracted nature of Board proceedings threatens to circumscribe the Board's ability to fully remediate unfair labor practices." *Bloedorn*, 276 F.3d at 300.

Here, in light of the nature of the unfair labor practices charged and the evidence presented, the Court concludes that interim relief would prevent Advocate from continuing to engage in what the NLRB will likely find is an unfair labor practice, while the charges remain pending before the NLRB. A grant of interim relief would therefore be in the public interest. *See, e.g.*, *Spurlino*, 546 F.3d at 502 (finding that injunctive relief was in the public interest where the Director met his burden of showing irreparable harm and a likelihood of success on the merits with regard to a charge of unfair labor practices under § 8(a)(5)); *Bloedorn*, 276 F.3d at 300 (same).

Advocate asks the Court to conclude otherwise, arguing that a grant of injunctive relief would harm the public interest by forcing Advocate to recognize the Union "as the representative of a group of employees in which it lacks majority status." Resp't's Br. at 34. Again, however, this argument speaks to the Director's likelihood of success on the merits. The Court accordingly rejects this argument for the same reason that it rejected it *supra* in discussing the issue of irreparable harm.

Advocate also argues that interim relief would be contrary to the public interest because it would encourage "the undue proliferation of bargaining units in the healthcare industry." *Id.*

This argument, too, is unpersuasive, because Advocate has not supported it with any evidence. *See Specialty Healthcare*, 357 NLRB at 946–47 (rejecting argument that certifying a bargaining unit of nursing assistants in nursing homes would lead to undue proliferation of bargaining units in the healthcare industry where employer presented insufficient evidence that certification would cause "an increased risk of work disruption or other adverse consequences").

For these reasons, the Court finds that the Director has met his burden of demonstrating that an award of interim relief would be in the public interest. Because the Director has also met his burden with respect to the requirements of irreparable harm, lack of an adequate remedy at law, and likelihood of success on the merits, the Director's petition for injunctive relief pursuant to § 10(j) is granted.

## D.     Advocate's Motions for Summary Judgment and Judicial Notice

As noted above, before the preliminary injunction hearing took place, Advocate filed a motion for summary judgment with regard to the Director's petition. In addition, after the hearing, Advocate filed a motion asking the Court to take judicial notice of the NLRB's website pursuant to Federal Rule of Evidence 201. The Court will address each motion in turn.

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To survive summary judgment, the nonmovant must establish some genuine issue such that a reasonable fact finder could find in her favor. *See Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012). In reviewing a motion for summary judgment, the Court gives the nonmoving party "the benefit of conflicts in the evidence and reasonable inferences that could be drawn from it." *Grochocinski v. Mayer Brown Rowe & Maw, LLP*, 719 F.3d 785, 794 (7th Cir. 2013).

Here, the Director has offered numerous genuine disputes of fact that render summary judgment inappropriate. For example, the Director presented evidence of irreparable harm, showing that the Union has lost its ability to bargain with Advocate over terms and conditions of employment, file grievances on its members' behalf, or represent members in disciplinary meetings. Hr'g Tr. at 51–53, 170–72, 206, 265–66. In addition, for the reasons explained at length above, the Director not only created a genuine dispute as to his chances of succeeding in the NLRB proceeding, but satisfied his burden of showing that he has a reasonable likelihood of success on the merits. Advocate's motion for summary judgment is accordingly denied.

Advocate's motion to take judicial notice is also denied. In its post-hearing brief, Advocate stated that the reason it refused to bargain with the Union is that refusing to bargain was the only means by which Advocate could initiate a legal challenge to the appropriateness of the bargaining unit. Resp't's Br. at 1–2. In reply, the Director disagreed, explaining that Advocate could have challenged the appropriateness of the bargaining unit by simply "fil[ing] a petition for a union election among the Unit after the takeover." Reply at 5, ECF No. 73. Determined to have the last word on this issue, Advocate then filed its motion to take judicial notice, asking the Court to take judicial notice of certain information on the NLRB's website in support of its position that it had no alternative means of legally challenging the unit's appropriateness. *See* Resp't's Mot. Judicial Notice at 1–2.

The parties have not provided—and the Court does not discern—any reason why this dispute is relevant to the issues that must be decided in this case. Although Advocate's refusal to bargain with the Union is certainly relevant to the Director's likelihood of success on the merits, as explained above, the legal strategy underlying Advocate's refusal is immaterial. Advocate's motion to take judicial notice of the NLRB's website is therefore denied as moot.

## IV. Conclusion

For the reasons stated herein, the Director's amended petition for injunctive relief pursuant to § 10(j) of the National Labor Relations Act [20] is granted. Advocate's motion for summary judgment [39] is denied. In addition, Advocate's motion to take judicial notice of the NLRB's website [76] is denied as moot. The parties are ordered to meet and confer and to submit a proposed injunction order to the Court by August 18, 2017, in accordance with the Court's holding herein.

**IT IS SO ORDERED.**          **ENTERED    8/11/17**

_____

**John Z. Lee**
**United States District Judge**